The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Hoag. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
***********
The Full Commission finds as fact and concludes as matters of law, the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between defendant-employer and plaintiff-decedent at all relevant times.
3. Defendant was self-insured through Riscorp National Insurance Company, now Zenith Insurance Management Services.
4. Plaintiff-decedent died while working on the premises of defendant-employer on 14 July 1996.
5. Plaintiff-decedent's cause of death was ischemic heart disease secondary to coronary artery disease.
6. The following documents have been stipulated into evidence:
a. Medical reports
b. Marriage certificate of Harold R. Bare and Gloria Bare.
c. Birth certificates of Jonathan N. Bare and Brett A. Bare.
d. Death certificate of Harold R. Bare.
e. Funeral home certificate of expenses.
7. The issue for determination is whether plaintiff-decedent sustained an injury by accident on 14 July 1996 that caused his heart attack and death.
***********
Based upon the findings of fact found by the Deputy Commissioner, the Full Commission finds as follows:
 FINDINGS OF FACT
1. Plaintiff-decedent was a 46-year-old male employed by defendant-employer for approximately five years prior to his death.
2. At the time of his death, decedent was married to Gloria Bare. Plaintiff-decedent had two sons, Brett Alan Bare, born 21 July 1980 and Jonathan Neil Bare, born 28 June 1977. In 1996, only Brett Alan Bare and Gloria Bare were wholly dependent upon plaintiff-decedent on 14 July 1996.
3. Plaintiff-decedent regularly exercised and was an active person. His non-work related activities included walking, playing softball and, on occasion, lifting weights. Plaintiff-decedent coached his sons' little league baseball teams and during the baseball season plaintiff-decedent would run track with the team on a daily basis. Plaintiff-decedent had been coaching his sons' baseball teams for three to four years prior to his death. Plaintiff-decedent also coached his sons' basketball and football teams. In addition, plaintiff-decedent performed yard work that included hoeing, tilling and planting the garden. Plaintiff-decedent also regularly pushmowed the family's one-half acre yard.
4. Mr. William Marlowe, a co-employee of plaintiff-decedent who was also a security guard, described the duties of a security guard at the hearing. Mr. Marlowe's work schedule and job duties were the same as those of plaintiff-decedent.
5. Plaintiff-decedent worked from 8 p.m. to 8 a.m. for seven straight days and then was off duty for seven straight days. The job duties of a security guard ranged from occasionally shoveling snow to patrolling defendant-employer's property. Particularly during the summer months, security guards were requested four to five times a week to assist guests and homeowners with their luggage. They also regularly assisted the guests and homeowners by carrying groceries to and from their vehicles and living units, retrieving items such as cribs and blankets. Plaintiff-decedent performed all of these duties as a regular part of his normal job routine.
6. Plaintiff-decedent's ordinary job duties also included patrolling defendant-employer's property on an hourly basis. The property is located at the top of Beech Mountain and contains 242 units located in eight buildings. None of the buildings contains elevators and the only means of accessing units is by stairs. Plaintiff-decedent climbed approximately 40 flights of stairs each night and walked on average, one and one-half to three miles each shift.
7. Mr. and Mrs. James Mixon, whose depositions were taken, recalled the events surrounding their contacts with plaintiff-decedent. On 15 June 1996, the Mixons arrived at the Pinnacle Inn. Plaintiff-decedent assisted them in unloading their car. The Mixon's unit was located on the first floor, which required climbing one flight of steps. Plaintiff-decedent made five or six trips between the car and the Mixon's unit, carrying the Mixon's luggage as well as assorted groceries. According to both Mr. and Mrs. Mixon, plaintiff-decedent had no complaints of physical problems, did not appear to be winded or short of breath and did not appear to have any difficulty with the luggage on 15 June 1996.
8. During the week prior to his date of death, plaintiff-decedent went on a fishing trip to Tennessee with his two sons.
9. On the evening of 14 July 1996, plaintiff-decedent arrived at work and was informed that the Mixons had requested his assistance in loading their vehicle prior to their departure. The evening was mild and damp. There was no excessive heat.
10. Plaintiff-decedent walked the 335 feet that separated the office building, where he received the message, and the Mixon's unit. Plaintiff-decedent performed the reverse process that he had performed on 15 June 1996 by making five or six trips between the unit and their car carrying the Mixon's luggage and other packages, including a bag of onions, to their vehicle. The distance between the Mixon's car and their unit was approximately 35 feet and required plaintiff-decedent to climb one flight of stairs.
11. Plaintiff-decedent did not take the Mixon's cooler to their car. The cooler was the heaviest item. The other luggage weighed the same as it had on 15 June 1996.
12. Plaintiff-decedent did not have any difficulty in carrying the items enumerated above to the Mixon's car. Moreover, he was not hurried in any way.
13. After the car was loaded plaintiff-decedent and Ms. Mixon walked to the steps adjacent to the Mixon's unit and conversed for approximately four to five minutes. During this conversation, plaintiff-decedent did not appear to Ms. Mixon to be winded, short of breath or to be having any physical problems. Upon the completion of the conversation, plaintiff-decedent turned to return to the office when he fell to the ground as a result of a heart attack. Plaintiff-decedent died shortly thereafter.
14. Plaintiff-decedent suffered from hypertension that was diagnosed on 17 August 1982 and again on 9 November 1993 by Dr. Joseph D. Barker. On 5 July 1994 plaintiff-decedent's blood pressure measured 172/128. On 25 July 1994 Dr. Barker prescribed medication in an effort to control plaintiff-decedent's blood pressure. On subsequent visits to Dr. Barker, despite the medication, plaintiff-decedent's blood pressure was higher than optimal. On 3 November 1994 his blood pressure was 162/100 and on 17 November 1994 150/90.
15. On 29 December 1994, Dr. Barker advised plaintiff-decedent to lose weight as he had gained approximately fifteen pounds over the past few months. On 18 April 1996, two months before his death, plaintiff-decedent again presented to Dr. Barker because his blood pressure medication had run out. Dr. Barker advised plaintiff-decedent to return in 1-2 weeks for re-evaluation of his blood pressure; however, plaintiff-decedent did not return. On 18 April 1996, plaintiff-decedent had weighed 235 pounds. However, at the time of his death he weighed 270 pounds.
16. The deposition of Dr. Christopher Sholes, a cardiologist, was taken on 5 August 1998. Dr. Sholes had never treated plaintiff-decedent. According to Dr. Sholes, plaintiff-decedent's level of physical activity and physical exertion (on 14 July 1996) could certainly be a precipitating factor initiating plaintiff-decedent's heart attack and subsequent death.
17. Dr. Sholes' opinion regarding causation is not given significant weight for the following reasons: In arriving at his opinion, Dr. Sholes stated there was no evidence in plaintiff-decedent's family physician's records identifying symptomatic heart disease prior to 14 July 1996. This is clearly erroneous. Dr. Sholes was also not aware that plaintiff-decedent maintained an active personal life, including coaching his sons' athletic teams, running track with his son's baseball team and pushmowing his yard regularly. Further, Dr. Sholes was not provided with an explanation of plaintiff-decedent's job duties, nor was he provided with the distance that plaintiff-decedent carried the Mixon's luggage.
18. Dr. Sholes' opinion that lifting a 25-pound bag of onions and the Mixon's luggage was "excessive" is not probative, as he had no knowledge of whether that type of exertion was atypical for plaintiff-decedent.
19. According to Dr. Sholes, plaintiff-decedent could have just as likely suffered a heart attack while jogging with his little league team or died when he was playing basketball or mowing his yard. Plaintiff-decedent's work did not place him at a greater risk of heart attack than the general public.
20. On the date of his death, plaintiff-decedent was performing his normal job duties. There was no unusual or unexpected event and the heart attack was not precipitated by any extraordinary or unusual exertion due to climatic or environmental conditions. Plaintiff-decedent's normal job duties included assisting residents with their luggage and groceries.
***********
Based on the foregoing Findings of Fact, the Full Commission concludes as follows:
 CONCLUSION OF LAW
Plaintiff-decedent was performing his normal job duties on 14 July 1996 when he suffered a heart attack which was the result of ischemic heart disease secondary to coronary artery disease and not any unusual or extraordinary exertion experienced at work. When an employee suffers death from a heart attack while conducting his work in the usual manner, absent a showing that employee's heart attack was precipitated by some unusual or extraordinary exertion, the injury does not arise by accident and is not compensable. Cody v. Snider Lumber Company,328 N.C. 67, 399 S.E.2d 104 (1991).
***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 ORDER
1. Plaintiff-decedent's claim for death benefits and burial expenses must be and are hereby DENIED.
2. The parties shall share the costs due the Commission.
This the ___ day of November, 1999.
S/_____________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/_____________ THOMAS J. BOLCH COMMISSIONER
S/_____________ CHRISTOPHER SCOTT COMMISSIONER
DCS/bjp